UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

THE GULF AND MISSISSIPPI RIVER
TRANSPORTATION COMPANY, LTD.

VERSUS

BP OIL PIPELINE COMPANY, ET AL.

CIVIL ACTION

NO. 10-cv-256-JJB

**RULING ON MOTIONS FOR SUMMARY JUDGMENT**

Before the Court are cross-motions for summary judgment filed by plaintiff The Gulf and Mississippi River Transportation Company, Ltd. ("G&M") (Doc. 77) and defendant BP Oil Pipeline Company ("BP") (Doc. 72). Oppositions, reply briefs, and a sur-reply were also filed. (Docs. 76, 79, 80, 83 & 88). Oral argument is unnecessary. Jurisdiction exists under 28 U.S.C. § 1332. For the following reasons, the Court DENIES G&M's motion and GRANTS BP's motion.

I.

The relevant claim for purposes of these motions is G&M's claim for accounting as a co-owner with BP of land on Grand Terre Island in Louisiana, land that contains a pumping station of disputed ownership. The following facts are undisputed.

In 1957, G&M acquired a 1/5 interest in a 5.19 acre tract on Grand Terre Island ("the Tract"). On June 24, 1960, Gulf Refining Co. ("Gulf"), a corporate predecessor of Chevron Pipeline Co., acquired a twenty-year servitude on the Tract to construct and operate a pumping station. Although that servitude expired on June 24, 1980, Gulf continued to operate the pumping station, and on September 22, 1980, it filed suit to expropriate a right-of-way to ensure its continued use of the pumping station. G&M, as a co-owner of the Tract, was named in the suit and served on September 25, 1980. Gulf, however, did not prosecute the suit to judgment.

1

Nevertheless, though, G&M at that time had notice of Gulf's trespass on the land following the expiration of the servitude.

On September 1, 1986, during the pendency of the suit initiated by Gulf (which had since been overtaken by Chevron as its successor), Chevron sold its interest in the pumping station to Sohio Pipeline Co. ("Sohio"), BP's corporate predecessor. On October 11, 1988, Chevron purchased an undivided 1/8 of 3/25 (0.015) fee interest in the Tract, which it then sold to Sohio/BP on November 23, 1988. BP continued to operate the pumping station until June 30, 2006, when BP sold its interests in the pumping station and the Tract to Plains Pipeline, LP. Thus, BP possessed and operated the pumping station from September 1, 1986, until May 23, 2006.[1]

On April 15, 2010, G&M filed suit against Chevron and BP, alleging *inter alia* that BP owes it income, revenue, and profits during BP's ownership of the pumping station because G&M alleges it obtained co-ownership in the pumping station following the expiration of Gulf's servitude, thus making BP liable for an accounting due a fellow co-owner.[2] These summary judgment motions deal with whether G&M acquired co-ownership over the pumping station and whether its remedies are limited by Louisiana's *St. Julien* doctrine, now codified at La. R.S. 19:14.

II.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact." Fed. Rule Civ. P. 56(a). The party seeking summary judgment

---

[1] There is some discrepancy in the record about whether this date or June 30, 2006, was the date of transfer. However, because G&M admits May 23, 2006, is the correct date (*see* Statement of Undisputed Facts, Doc. 76-3, at 6, ¶ 18), the Court uses that date here. At any rate, the roughly one month difference is not material.
[2] The Court dismissed Chevron from this litigation by granting summary judgment to it on G&M's trespsass claim. (Ruling, Doc. 53; Entry of Final Judgment, Doc. 55). The Fifth Circuit affirmed. (Doc. 69).

carries the burden of demonstrating that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When the burden at trial rests on the non-moving party, the moving party need only demonstrate that the record lacks sufficient evidentiary support for the non-moving party's case. *Id.* The moving party may do this by showing that the evidence is insufficient to prove the existence of one or more essential elements of the non-moving party's case. *Id.* A party must support its summary judgment position by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. Rule Civ. P. 56(c)(1).

Although the Court considers evidence in a light most favorable to the non-moving party, the non-moving party must show that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49 (1986). Conclusory allegations and unsubstantiated assertions will not satisfy the non-moving party's burden. *Grimes v. Tex. Dep't of Mental Health*, 102 F.3d 137, 139-40 (5th Cir. 1996). Similarly, "[u]nsworn pleadings, memoranda or the like are not, of course, competent summary judgment evidence." *Larry v. White*, 929 F.2d 206, 211 n.12 (5th Cir. 1991), *cert. denied*, 507 U.S. 1051. If, once the non-moving party has been given the opportunity to raise a genuine fact issue, no reasonable juror could find for the non-moving party, summary judgment will be granted for the moving party. *Celotex*, 477 U.S. at 322.

III.

G&M contends is that it co-owns the pump station, entitling it to a share of the fruits and revenues derived from it. When G&M granted the 1960 servitude which expressly authorized and consented to construction of the pump station at issue here (*see* Doc. 72-2), title to the pump station was vested in the servitude grantee, Gulf. *See* La. C.C. art. 493 ("Buildings [and] other

3

constructions permanently attached to the ground … made on the land of another with his consent belong to him who made them.").

G&M argues that the terms of the servitude gave Gulf 90 days following expiration of the servitude to remove the pumping station, under penalty of losing ownership. The servitude reads:

> The rights herein granted shall be for a term of 20 years from and after the date hereof, after which term, all of said rights shall cease and terminate. Grantee shall have a period of 90 days after the expiration of this grant in which to remove its property and equipment which may have been placed on the above described land.

(Doc. 72-2, Ex. A, at 1). At the relevant time in 1980 when the servitude expired, Article 493 did not provide for what happened in such a situation. In 1984, the legislature decided to fill that gap, recognizing "there was no express provision of law that determined the rights and obligations of the owner of the improvements and the rights and obligations of the owner of the ground when their legal relationship terminated." La. C.C. art. 493, comment (b) to 1984 Amendment. To that end, the legislature imposed a 90 day interval whereupon, after written demand from the landowner, the owner of the improvements forfeits ownership to the landowner if the improvements are not removed. La. C.C. art. 493, 1984 Amendment. The extinguishment of a predial servitude was specifically cited as a situation to which the 1984 Amendment could apply. *Id.*, comment (b).

The 1984 Amendment to Article 493 does not, of course, govern the legal effect of the servitude's expiration in 1980.[3] Given the gap in Article 493's coverage at the time, as later

---

[3] BP erroneously asserts the 1984 Amendments were made retroactive. (BP's Memo. in Supp., Doc. 72-1, at 19). The 2003 Amendment was later declared in 2004 by the Louisiana House of Representatives to have retroactive application. *See* House Concurrent Resolution Nos. 134 & 306, 2004 Regular Session. And while the Court appreciates this guidance on legislative intent, a 2003 legislative act cannot divest a party of rights allegedly vesting in 1980. To do so would run afoul of, among other provisions, the Due Process and Contract Clauses of the federal

recognized in the 1984 Amendments, this Court must look to interpretive caselaw from 1980 and before. Of course, this puts the Court in an awkward situation of pretending to not know the answer eventually provided by the legislature in 1984 and subsequently clarified beyond peradventure by the Louisiana Supreme Court in *Giorgio v. Alliance Operating Corp.*, 921 So.2d 58 (La. 2006) (abrogating cases from the Fourth Circuit Court of Appeal holding that failure to remove property after a lease or servitude ends causes ownership to pass to the landowner even absent proper demand). Nevertheless, a retrospective analysis of Louisiana law circa 1980 is what the facts and posture of this case call for, and the Court now turns to that task.[4]

A.

G&M cites two pre-1980 cases that are relevant to the Court's analysis: *Breaux v. Rimmer & Garrett, Inc.*, 320 So.2d 214 (La. App. 3d Cir. 1975) and *Donnell v. Gray*, 34 So.2d 648 (La. App. 2d Cir. 1948), *rev'd on other grounds*, 41 So.2d 66 (La. 1949). Both of these cases applied the law of abandonment and occupancy to the property remaining after expiration of the lease or servitude under which that property had been brought onto the subject premises.

In *Donnell v. Gray*, the Louisiana Supreme Court reversed the Second Circuit Court of Appeal's finding that a former lessee abandoned property relating to an oil and gas lease. Construing La. C.C. art. 3418 (formerly, article 3421 of the Civil Code of 1870), the abandonment provision, the Supreme Court found that "actual abandonment, coupled with an intent to abandon" was the standard for determining legal abandonment. *Donnell*, 41 So.2d at

---

and state constitutions. *See Smith v. Bd. of Trustees of La. St. Employees' Retirement System*, 851 So.2d 1100, 1105 (La. 2003).

[4] Despite successfully arguing that the Court cannot look to the law after 1980 to determine what rights arose from Gulf's failure in 1980 to remove the improvements after the servitude expired, G&M strangely relies on *Melerine v. State*, 773 So.2d 831 (La. App. 4th Cir. 2000). This case has the unfortunate distinction of being decided twenty years too late, being singled out for abrogation by the Louisiana Supreme Court in *Giorgio*, and serving as the impetus for the legislature's decision to apply the 2003 Amendments retroactively. Whatever the law was in 1980, *Melerine* wasn't it.

5

67. Then, in conjunction with La. C.C. art. 3412 (formerly, articles 3412-14 of the Civil Code of 1870), the occupancy provision(s), the Court found the former lessee "had the right to reclaim the equipment, even if inferentially abandoned, as long as his title thereto had not been lost by virtue of [the landowner's] adverse occupancy…." 41 So.2d at 68. Because the landowner never claimed ownership in the equipment, but only held the equipment to secure the alleged damage he sustained as a result of the former lessee's operation, adverse occupancy had not been established the title to the equipment remained with the former lessee. *Id.*

In *Breaux v. Rimmer & Garrett, Inc.*, the landowners gained title to a pipeline in a right-of-way that had been admittedly abandoned for 17 years prior to its removal. 320 So.2d at 216. Thus, when the State was granted a right-of-way along the same property and contracted to build a highway across it, the landowners retained ownership in the pipe. *Id.* at 216-17. However, the court noted that the landowners "did not become the owners of the pipe by the mere extinguishment of the servitude…." *Id.* at 217. Rather, the court cited *Donnell* for the proposition that, absent language in the servitude on the issue, lessees have a reasonable period of time after extinguishment to remove his property before a presumption of abandonment arises. *Id.*

A later authoritative reading of *Breaux* confirms this. The Louisiana Supreme Court in *Guzzetta v. Texas Pipe Line Co.*, 485 So.2d 508, 511 n. 2 (La. 1986), found *Breaux*'s expression of pre-1984 Amendment jurisprudence on Article 493 correct insofar as accessories of an extinguished servitude continue to belong to the owner of the accessories until abandonment, at which time the landowner acquires ownership by accession.

B.

As the cases and then-applicable Code articles demonstrate, to have an ownership claim in the pump station, the pump station must have been actually abandoned by BP with intent to abandon, and G&M or its co-owners must have actually or constructively occupied or possessed it with the intent to own. *Donnell*, 41 So.2d at 67-68. But as the undisputed facts demonstrate, this cannot be the case. First, there is simply no allegation, much less evidence, that BP did anything other than continually possess, occupy, and use the pumping station. So contrary to G&M's suggestion, BP never abandoned it, which is a necessary prerequisite for it as landowner to obtain ownership. Without an actual abandonment, G&M certainly cannot show BP's intent to abandon. Nor has it shown any act exercising control over the pumping station sufficient to constitute occupancy or possession with intent to own.

G&M argues that the 90 day removal provision in the servitude serves as an *ex ante* demand sufficient to trigger a presumption of abandonment once the 90 day period ran. The servitude establishes that after the 20 year term ends, "all of said rights shall cease and terminate." Moreover, it provides for "a period of 90 days after the expiration of this grant in which to remove its property and equipment which may have been placed on the … land." (Servitude, Doc. 72-2, at 1). But as *Breaux* stated, the period of time granted by the servitude for removal of a former possessor's property merely establishes a presumption of abandonment once that period has run. And as *Donnell* clearly holds, there must be both an act of abandonment and intent to abandon. When a former lessee or right-of-way holder has no contract with the property, the presumption may fairly arise. However, this Court cannot attribute any semblance of abandonment—actual, presumed, or otherwise—to the actions of Gulf, BP, and others within the chain of "title" to the pumping station. Neither *Breaux* nor *Donnell* dealt with the situation here, where a servitude grantee effectively holds over past the term of the grant.

7

The language from 1960 G&M claims effectuated a demand to vacate once the servitude expired in 1980 does not suffice. *Donnell* held that even a presumption of abandonment (which as has been discussed, G&M cannot squeeze out of the facts here) disappears or may be negated when a former lessee/grantee commits acts of ownership inconsistent with the presumed abandonment following the expiration of the lease or servitude. That is obviously the case we have here. G&M has not pled, alleged, or shown evidence that it ever made any demand or took any action to establish occupancy or ownership over the pump station. This conclusion faithfully applies *Donnell* and, not surprisingly, reaches the same result that would have been reached had the 1984 or 2003 Amendments to La. C.C. art. 493 been the operative law in 1980. The most that can be said of the 1960 servitude's language is that it gave Gulf a limited 90 day window where Gulf would not be treated as a trespasser should it return to claim any leftover property on the premises of the servitude. It did not, however, effect the type of demand required to trigger the presumption of abandonment, nor can it eliminate the obvious acts of Gulf and its successors manifesting a desire to do anything *but* abandon the pumping station.

C.

G&M next contends that, even if it does not own the pumping station itself, because the pumping station sits on the Tract, a co-owned asset, it is thus entitled to the fruits and revenues from the pumping station. The two cases it cites, *Knoll v. Delta Development Co.*, 218 So.2d 109 (La. App. 3d Cir. 1969) and *Juneau v. Laborde*, 82 So.2d 693 (1955), are inapposite. Both deal with the fruits and revenues of crops cultivated from the co-owned property. Needless to say, the pumping station is not the fruit of the land on which it sits, and therefore the analogy to crops does not work. G&M cannot reap the fruits and revenues from something it does not co-own.

IV.

G&M has failed to establish ownership over the pumping station. The Court next must determine whether it may recover damages for the allegedly unauthorized use of the pumping station on the Tract. This inquiry necessitates a discussion of La. R.S. 19:14, the codification of the *St. Julien* doctrine.

The so-called *St. Julien* doctrine derives from the Louisiana Supreme Court's decision in *St. Julien v. Morgan La. & Tex. R.R. Co.*, 35 La. Ann. 924 (La. 1883). The Louisiana Legislature later codified *St. Julien* in La. R.S. 19:14 in 1976. The *St. Julien* doctrine permits creation of a servitude by estoppel, allowing a quasi-public corporation with expropriatory power to acquire a servitude over land outside the expropriation process if the landowner consents or acquiesces. *See Lonatro v. Orleans Levee Dist.*, 809 F.Supp.2d 512, 518 (E.D. La. 2011). In pertinent part, the statute reads:

> In the case where any corporation referred to in R.S. 19:2 has actually, in good faith believing it had the authority to do so, taken possession of privately owned immovable property of another and constructed facilities upon, under, or over such property with the consent or acquiescence of the owner of the property, it will be presumed that the owner of the property has waived his right to receive just compensation prior to the taking, and he shall be entitled only to bring an action for judicial determination of whether the taking was for a public and necessary purpose and for just compensation to be determined in accordance with R.S. 19:9, as of the time of the taking of the property, or right or interest therein, and such action shall proceed as nearly as may be as if the corporation had filed a petition for expropriation as provided for in R.S. 19:2.1.

La. R.S. 19:14(B).[5] The statute thus establishes the following elements for creating a *St. Julien* servitude:

(1) The appropriating body has been granted powers of expropriation;
(2) The appropriating body constructs a facility in the public interest[6];

---

[5] La. R.S. 19:2 denominates the types of corporate entities having expropriation powers, which includes "[a]ll persons included in the definition of common carrier pipelines as set forth in R.S. 45:251." La. R.S. 19:2(8). Section 45:251, in turn, defines who qualifies as a common pipeline carrier of petroleum.

> (3) The appropriating body possesses the property and constructs the facility with a good faith belief in its authority to do so; and
> (4) The landowner consents to or acquiesces in the taking.

Moreover, because La. R.S. 19:14 incorporates the procedural provisions of La. R.S. 19:2.1, "[a]ll claims for … damages to the owner caused by the expropriation of property … shall be barred by the prescription of two years commencing on the date on which the property was actually occupied and used for purposes of expropriation." La. R.S. 19:2.1(B); *see, e.g., Sellers v. St. Charles Parish*, 655 So.2d 367, 371-72 (La. App. 5th Cir. 1995).

G&M contests only whether BP acted in good faith and whether it consented to or acquiesced in the taking at issue. Thus, it is undisputed that the first two elements are met.[7]

G&M acknowledges that Gulf, the holder of the 1960 servitude, constructed the pump station under the express terms of the 1960 servitude. Thus, Gulf had both a good faith belief in its powers to possess the property on which the pump station was constructed and a good faith belief in its authority to construct the pump station. (*See* 1960 Servitude Agreement, Doc. 72-2, Ex. A, at 1-2 (granting servitude to Gulf "for the purpose of constructing, maintaining and operating thereon a booster pump station to be used in connection with the transportation by pipe line of oil…").

G&M argues that Gulf's good faith ended when the twenty-year term of the servitude ended such that it destroys subsequent claims of good faith possession by BP. But this does not accord with Louisiana jurisprudence. *Campbell v. La. Intrastate Gas Corp.*, 528 So.2d 626 (La.

---

[6] This requirement arises from the requirement that expropriating entities establish the public use to which the taken property will be put. *See* La. R.S. 19:2.1(A)(2).

[7] While G&M appears to half-heartedly contest whether BP adequately introduced affidavit facts showing the pipeline was continuously used for a public purpose as a common carrier of petroleum through the pipeline and the pumping station (*see* Statement of Undisputed Facts, Doc. 76-3, at 6-7), G&M's briefing does not manifest any dispute on the issue when discussing the alleged inapplicability of the *St. Julien* doctrine. Thus, the Court treats this fact as established.

App. 2d Cir. 1988), illustrates the insurmountable problem G&M faces. In *Campbell*, a pipeline was built in the late 1920s, and rights-of-way to the pipeline granted by the landowner were passed to several companies, with defendant finally acquiring the right-of-way in 1958. 528 So.2d at 627. Meanwhile, the original landowner's mortgage-holder foreclosed on the property in 1935 and sold it to the plaintiffs in 1943. *Id.* The trial court found the mortgage primed the servitude creating the right-of-way, and thus the foreclosure sale wiped it out and gave the plaintiffs free and clear title. *Id.* at 628. Nonetheless, plaintiffs assumed the pipeline operators had a valid right-of-way until 1984, when they finally protested to the defendant. *Id.* at 627. The trial court had found the *St. Julien* doctrine inapplicable, but the appeals court reversed. *Id.* at 628. The Second Circuit found the focus should be on the long, uninterrupted use of the pipeline from 1943 to 1984, not on defendant's isolated conduct at the time the protest was lodged by the landowner. *Id.* at 629. Therefore, the defendant was found to have used the existing pipeline in good faith, and the forty-plus year period showed plaintiff's acquiescence. *Id.* The Court therefore applied the *St. Julien* doctrine and found the two year prescriptive period barred the trial court's award for the value of the property expropriated. *Id.*

G&M is certainly correct that BP's position in relation to them differs in one respect from the parties in *Campbell*. The plaintiffs in *Campbell* received royalties from gas wells on their property that the pipeline serviced, but plaintiff here receives no such benefit. They are moreover correct in stating the truism that one "cannot accept the benefits of an act and repudiate its obligations." *Southwest Steel Corp. v. Jumonville*, 81 So.2d 875, 879 (La. 1955). However, simply because the plaintiffs in *Campbell* were arguably susceptible to some form of estoppel-based argument—an argument the *Campbell* court did not raise or decide—in no way undercuts *Campbell*'s reasonable conclusion that a succeeding pipeline operator may point to its

11

predecessors' prior uses to establish the applicability of the *St. Julien* doctrine and show a plaintiff's acquiescence.[8]

More fundamentally, though, it is unclear why BP should have to show good faith. The statute by its own terms only imposes a good faith obligation when taking possession of the property and constructing facilities thereon. Obviously, it was Gulf, not BP, who first took possession and constructed the pump station. And regardless of whether Gulf itself was a good faith possessor at the instant the 1960 servitude expired in 1980, it originally had a good faith belief in its authority to possess the land and construct the pump station by virtue of the 1960 servitude.

BP, when it took possession and began using the pump station in 1986, knew G&M had explicit knowledge of the use of the pumping station beyond the servitude's duration because it was served with suit in 1980 and knew G&M had not protested in any way during those six intervening years. And once BP gained a fee ownership interest in the Tract in 1988, whatever arguably improper legal footing it had for possessing and using the pump station disappeared because it could possess and use the land as a co-owner in indivision in full compliance with the law. Based on these two separate but interrelated facts, it is difficult to detect an absence of good faith on BP's part.

The acquiescence by G&M of over 6 years at the time BP took possession extended to nearly 30 years before G&M filed suit. Nowhere in the record or in G&M's briefing does it point to a single instance of protest or a single demand made against *any* of the possessors, operators, or owners of the pump station. There is simply nothing showing G&M did anything other than acquiesce to the continued operation of the pump station.

---

[8] In this regard, *Campbell* implicitly imports the law on "tacking" when analyzing *St. Julien* situations.

Because G&M acquiesced to the continued possession and use of the pump station by BP and others, and because BP did not possess or operate the pump station in bad faith regard for G&M's ownership interests, the Court finds the *St. Julien* doctrine applies to G&M's claim against BP. Because BP transferred its interest in the pump station and the Tract in May 2006 and G&M did not file suit until April 2010, the Court must conclude that BP "actually occupied and used" the pump station more than two years before G&M filed suit. *See* La. R.S. 19:2.1(B). G&M's claim is therefore prescribed under the two-year prescriptive period applicable to *St. Julien* doctrine claims under La. R.S. 19:14.

V.

Accordingly, G&M's motion for summary judgment (Doc. 77) is DENIED. Further, since BP Oil Pipeline Company has demonstrated its entitlement to judgment as a matter of law, its motion for summary judgment (Doc. 72) is GRANTED.

Signed in Baton Rouge, Louisiana, on July 11, 2012.

_____
**JAMES J. BRADY, DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**